# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-01312-COA

AMY WILKERSON A/K/A AMY DANIELLE WILKERSON          APPELLANT

v.

STATE OF MISSISSIPPI          APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 07/27/2018 |
| TRIAL JUDGE: | HON. DALE HARKEY |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | WILLIAM TUCKER CARRINGTON |
| | CARRIE B. SPERLING |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LISA L. BLOUNT |
| | CANDICE LEIGH RUCKER |
| NATURE OF THE CASE: | CIVIL - POST-CONVICTION RELIEF |
| DISPOSITION: | REVERSED AND REMANDED - 11/24/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**BARNES, C.J., FOR THE COURT:**

¶1. Amy Wilkerson was charged with capital murder in 2005 after an eight-week-old infant in her care died from injuries consistent with what the doctors termed "shaken-baby syndrome" (SBS).[1] Because Wilkerson had given a statement to police in which she admitted to shaking the infant to wake him, and the defense expert's report confirmed the SBS diagnosis, Wilkerson's attorneys advised her to enter a guilty plea to a reduced charge

---

[1] Although the record notes that the more recent terminology for SBS is "abusive head trauma" or "AHT," the parties use the term "SBS" in their briefs; so we will use that term where appropriate.

of depraved heart murder. On May 24, 2007, Wilkerson pled guilty, and the Jackson County Circuit Court sentenced her to serve life in the custody of the Mississippi Department of Corrections (MDOC). Wilkerson filed a motion for post-conviction relief (PCR) in 2010, which the circuit court dismissed. We affirmed the court's decision in *Wilkerson v. State*, 89 So. 3d 610 (Miss. Ct. App. 2011).

¶2.     This appeal originates from Wilkerson's filing a second amended PCR motion on May 26, 2015, in which she asserted that (1) the State concealed from defense counsel material, exculpatory evidence of a previously undisclosed video of her interrogation; (2) shifts of opinion in the scientific community regarding the diagnosis of SBS constituted "newly discovered evidence" that demonstrates her factual innocence; (3) she received ineffective assistance of counsel; and (4) she is actually innocent. Finding her claims procedurally barred, the circuit court denied the motion without an evidentiary hearing. Wilkerson appeals the circuit court's ruling.

¶3.     Because we find that Wilkerson has demonstrated unresolved issues of fact, which if resolved in her favor would warrant her relief, we reverse and remand for the circuit court to conduct an evidentiary hearing in accordance with this opinion.

## FACTS AND PROCEDURAL HISTORY

¶4.     On July 18, 2005, while under Wilkerson's care, Tristan Chinn, an eight-week-old infant, became unresponsive and stopped breathing. Wilkerson called 911 and performed CPR on the child while awaiting the ambulance. Once at the hospital, it was determined by

2

the treating physicians that Tristan showed signs of SBS (i.e, subdural hemorrhage and retinal hemorrhage).

¶5.     The following day, Wilkerson went to the police station for questioning. Detective Ricky Jones read Wilkerson her *Miranda* rights[2] and informed her that he was audiotaping their discussion. Wilkerson told the detective that she had been babysitting Tristan for about one month. She said that the child previously had trouble breathing and waking up, but his parents has assured her that this behavior was normal. Wilkerson specifically noted an incident one month prior when the child would not wake up; she called Marty Chinn, Tristan's father, and the following events occurred:

> Marty came in and he looked at [Tristan] and he said you know that he must just really be tired and he was doing the trying to wake him up. He had him lay down and he'd take one arm and you know reach it over – like that – and then he'd take the other arm and just reach it. You know just anything to stimulate him you know. And he still didn't wake up.

Upon learning from the detective the extent of the child's injuries and the SBS diagnosis, Wilkerson became very upset and defensive, repeatedly denying that she had harmed the child while he was in her care. Wilkerson conjectured that the child possibly hit his head on a toy attached to his car seat when she picked him up. Wilkerson then told the detective that Tristan had fallen from her couch onto the floor; so she picked him really fast, and that was when he gasped and quit breathing. But Wilkerson consistently reiterated that she loved the child and had "never shaken that baby in a violent manner." Finally, Wilkerson asserted, "I

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

stand by my word. I want a lawyer. That's all I can do." Detective Jones then turned off the audio recorder.

¶6. Yet he continued to talk with Wilkerson off the record for another thirty-two minutes. This conversation was captured on a hidden video, unbeknownst to Wilkerson. During those thirty-two minutes, Wilkerson requested a lawyer two more times, stating "I want a lawyer"; "I quit. I want a lawyer." Detective Jones acknowledged, "I'm really not even supposed to be talking to you anymore. You asked for an attorney—okay—it's not on record." At that point, Wilkerson confessed to him that she "shook [Tristan] to try and get him to wake up." The detective repeated that he was "not even supposed to be talking to [her] right now," but he also suggested that Wilkerson could tell him that she did not want an attorney and that he could "start the tape again."

¶7. Detective Jones told Wilkerson, "There's no jury in the world that's gonna have sympathy for you. It'll go through a jury trial and that's the last thing you want." When Wilkerson replied that she would "need a lawyer regardless" and that an attorney would probably say that she should not have talked to the investigator, Detective Jones responded:

> They all say that. . . . They get more money if they go to trial. . . . And I know what the jury's going to do. Fifteen years minimum. . . . Nobody can afford [] attorneys. They'll tell you anything. You're right though. You can say I'm sorry I'm not going any further. And I'll say – that's okay Amy, I understand you're scared. And I'll leave the room. But then I can't promise you what I'll do later. I'll be really not happy Amy. And I'll do whatever I have to do to get – cause I'll realize that you weren't prepared to do the right thing. That you have no soul[.]

Before turning the audio recorder back on, Detective Jones warned Wilkerson, "You don't

4

have a choice. I told you earlier it's just me and you in this little small world right now." Wilkerson replied, "Turn [the tape recorder] back on. And hurry up before I change my mind." The investigator turned on the recorder and stated on the record that Wilkerson had asked for an attorney, and he questioned her, "Do you want to talk to me now without your attorney?" Wilkerson replied, "I guess so." Wilkerson then admitted that she shook Tristan to wake him, but referring to the prior incident when Tristan would not wake up, she clarified that she "was just doing what I saw his own father do. And it wasn't anything hard."

¶8. Tragically, Tristan died on July 20, 2005. A Jackson County grand jury indicted Wilkerson for capital murder on March 1, 2006. She initially entered a plea of "not guilty." On May 16, 2006, defense counsel filed a request for discovery, including "a copy of any written or recorded statement of the [d]efendant" and "any exculpatory material concerning the [d]efendant." The State provided defense counsel with two transcripts of the audiotaped interview; the second was a "corrected" copy of the first one. Neither transcript contained the thirty-two minutes of conversation captured on the video. A May 18, 2006 discovery receipt shows that a VHS tape was provided to Wilkerson's attorney. The only record evidence of the content of the VHS tape are affidavits by the district attorney's secretary and office manager, averring that the only VHS tape in the district attorney's file was Wilkerson's video interview with Detective Jones.[3] Eight years later, however, one of

---

[3] These affidavits, dated July 2015, were entered in response to the circuit court's May 19, 2015 order, requiring the State "to file an answer or other pleading responsive to [Wilkerson's 2015 PCR] petition[.]"

Wilkerson's attorneys attested that "to the best of [his] recollection[, he] did not receive a video that contained the non-audiotaped portion of Amy Wilkerson's interrogation."

¶9. Prior to trial, defense counsel hired an expert, Dr. Stephen Hayne, to review Tristan's autopsy photographs and medical records. On May 23, 2007, six days before the trial was scheduled to begin, Dr. Hayne provided a short, two-page report, confirming that the child's cause of death was "Shaken/Thrown Baby Syndrome." Upon receiving Dr. Hayne's report, Wilkerson's attorneys advised her to plead guilty to a reduced charge of depraved heart murder.

¶10. The following day, on May 24, 2007, a guilty-plea colloquy was held before the circuit court. The State submitted that it "would show that the child died from what's typically referred to . . . as 'shaken baby'" and that "the injuries were extensive" and caused the child's death. Wilkerson's defense counsel stated that after reviewing the file and "all the medical records," they felt that it would be in Wilkerson's "best interest to enter a plea to the reduced charge of murder." The circuit court asked Wilkerson, "Did you shake this baby?" She replied, "Yes, sir." The court then asked Wilkerson:

> You have indicated to me by your statements that you shook this baby, and on the proof of the State, there is little doubt that, should this matter proceed to trial, it would result in a substantial probability of your conviction. Knowing all of that, do you still desire to enter a plea of guilty?

Wilkerson responded affirmatively and entered a plea of guilty. The circuit court sentenced her to serve life in the custody of the MDOC.

¶11. In May 2010, Wilkerson filed a PCR motion, alleging that her plea was involuntary

6

and that defense counsel rendered ineffective assistance for failing to secure exculpatory witnesses who would testify that Tristan did not die from SBS. Wilkerson also argued that she was not afforded an opportunity at the plea colloquy to explain how she shook the child. The circuit court dismissed the PCR motion, and this Court affirmed the court's decision. *Wilkerson*, 89 So. 3d at 617 (¶27).[4]

¶12.    On January 16, 2015, Wilkerson simultaneously filed a second PCR motion and a motion for leave to amend her PCR motion, requesting time to obtain expert testimony with regard to the SBS diagnosis.[5]    The circuit court granted the motion to amend.    She subsequently filed a second motion for leave to amend, citing as newly discovered evidence the "entire interrogation video" containing the thirty-two minutes with Detective Jones not captured on audio or contained in the transcripts. Wilkerson filed her second amended PCR motion on May 26, 2015. In the motion, Wilkerson claimed that she should be allowed to withdraw her guilty plea or, in the alternative, the court should grant her an evidentiary hearing due to the following alleged errors:

---

[4] The Mississippi Supreme court denied Wilkerson's petition for writ of certiorari on May 31, 2012.

[5] Wilkerson had filed a PCR motion or, in the alternative, a motion for leave to proceed in circuit court with the supreme court on December 17, 2014. On January 14, 2015, the supreme court dismissed Wilkerson's PCR motion for lack of jurisdiction without prejudice to her right to file the motion in the circuit court. Because Wilkerson entered a guilty plea, she never directly appealed her conviction and sentence and was not required to seek leave from the supreme court before filing her PCR motion. *See* Miss. Code Ann. § 99-39-7 (Rev. 2015) (When a conviction has been affirmed on appeal, the supreme court must grant permission for a PCR motion to be filed in the trial court.). The circuit court granted her leave to file her motion on January 21, 2015.

(1) the State committed a *Brady* violation[6] by concealing material and exculpatory evidence (i.e, the videotape of her interrogation) from defense counsel;

(2) shifts in the scientific community's opinions regarding SBS constituted "newly-discovered evidence" demonstrating that Wilkerson was factually innocent;

(3) defense counsel rendered ineffective assistance by failing to (i) procure expert witnesses to challenge the SBS diagnosis, (ii) investigate Wilkerson's mental health and social history, (iii) interview pertinent witnesses, and (iv) move to suppress her statement after invoking her right to counsel; and

(4) she is actually innocent.

The State responded, asserting that Wilkerson's motion should be dismissed as both time-barred and successive-writ barred. The State also refuted Wilkerson's claim that the video was not produced during discovery, attaching the signed 2006 receipt showing that Wilkerson's attorney had received a VHS tape and the affidavits affirming that the VHS tape contained her interview with Detective Jones.

¶13. Finding that Wilkerson "failed to allege any applicable exception or violation of a fundamental right that would override [any] procedural bars," the circuit court denied Wilkerson's PCR motion without a hearing on July 27, 2018. Wilkerson appeals the court's ruling, contending she is entitled to an evidentiary hearing and the following allegations of error constituted statutory and fundamental-rights exceptions to overcome the procedural bars

---

[6] In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the United States Supreme Court held that a prosecution's suppression "of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

8

in this case:

> (1) there exists "newly discovered evidence" consisting of (i) expert testimony that Tristan had an underlying condition, cortical venous thrombosis (CVT), that lead to his death and (ii) the video of her interrogation;
>
> (2) the State's failure to provide the exculpatory video of her full interview in pretrial discovery violated her fundamental constitutional right to due process;
>
> (3) counsel rendered ineffective assistance by failing (i) to investigate the controversy over SBS in the medical community and procure witnesses with regard to the medical diagnosis and (ii) to file a motion to suppress based on the *Miranda* violations that occurred in the video, should it be determined that State provided the video to defense counsel.

We will address each of these contentions in turn.

## STANDARD OF REVIEW

¶14.    This Court reviews a circuit court's "dismissal or denial of a PCR motion for abuse of discretion," reversing only if the decision "is clearly erroneous." *Hayes v. State*, 282 So. 3d 1185, 1187 (¶4) (Miss. Ct. App. 2019) (quoting *Ware v. State*, 258 So. 3d 315, 317-18 (¶7) (Miss. Ct. App. 2018)).  Questions of law are reviewed de novo.  *Id*.

¶15.    A circuit court may "summarily dismiss a PCR motion without an evidentiary hearing 'if it plainly appears from the face of the motion, any annexed exhibits, and the prior proceedings in the case, that the movant is not entitled to relief.'" *Huggins v. State*, 291 So. 3d 401, 405 (¶12) (Miss. Ct. App. 2020) (quoting Miss. Code Ann. § 99-39-11(2) (Rev. 2015)).  For a movant "[t]o be entitled to an evidentiary hearing, [she] must demonstrate, by affidavit or otherwise, that there are unresolved issues of fact that, if concluded favorably to the [movant], would warrant relief." *Id*. (quoting *Moore v. State*, 248 So. 3d 845, 849 (¶12)

9

(Miss. Ct. App. 2017)). However, "[t]his may not be accomplished through the [movant's] own unsupported allegations." *Id*.

## DISCUSSION

¶16. Wilkerson's PCR motion is subject to procedural bars under the Uniform Post-Conviction Collateral Relief Act (UPCCRA), as it was filed outside the applicable three-year limitations period, *see* Miss. Code Ann. § 99-39-5(2) (Rev. 2015), and is a successive motion, *see* Miss. Code Ann. § 99-39-23(6) (Rev. 2015). The State also contends that because Wilkerson raised a claim of ineffective assistance of counsel in her May 2010 PCR motion, that claim is barred by the doctrine of res judicata.

¶17. "[T]here are several statutory and judicially created exceptions to the legislatively imposed time-bar." *Wood v. State*, 200 So. 3d 491, 493 (¶7) (Miss. Ct. App. 2016) (quoting *Blount v. State*, 126 So. 3d 927, 931 (¶13) (Miss. Ct. App. 2013)). For example, section 99-39-5(2)(a)-(b) exempts cases from the time-bar "in which the movant can demonstrate evidence not reasonably discoverable at trial." *Wood*, 200 So. 3d at 493 (¶7). Also excepted from the UPCCRA procedural bars are "errors affecting fundamental constitutional rights." *Id*. These rights include: "(1) the right against double jeopardy; (2) the right to be free from an illegal sentence; (3) the right to due process at sentencing; and (4) the right not to be subject to ex post facto laws." *Freeman v. State*, 294 So. 3d 1245, 1248 (¶8) (Miss. Ct. App. 2020) (citation and internal quotation mark omitted). Furthermore, "'[u]nder extraordinary circumstances,' ineffective assistance of counsel can constitute an exception to the statutory

10

time-bar." *Morales v. State*, 291 So. 3d 363, 369 (¶24) (Miss. Ct. App. 2019) (quoting *Brown v. State*, 187 So. 3d 667, 670-71 (¶7) (Miss. Ct. App. 2016)), *cert. denied*, 289 So. 3d 310 (Miss. 2020). The burden is on the movant "to prove an exception applies." *Blount*, 126 So. 3d at 931 (¶14).

## I.     Newly Discovered Evidence

¶18.     In her PCR motion, Wilkerson submitted that she is factually innocent, citing a shift in the medical and scientific community over the past few years with regard to the diagnosis of SBS, which she argued constituted newly discovered evidence, excepting her motion from any procedural bars. Excepted from the prohibition against a successive writ is when a movant "has evidence, not reasonably discoverable at the time of trial, which is of such nature that it would be practically conclusive that, if it had been introduced at trial, it would have caused a different result in the conviction or sentence." Miss. Code Ann. § 99-39-23(6). This Court has held:

> To constitute newly discovered evidence the movant must show the evidence: (1) will probably produce a different result or verdict, (2) has been discovered since trial and could not have been discovered before trial by the exercise of due diligence, (3) is material to the issue, and (4) is not merely cumulative or impeaching.

*Porter v. State*, 281 So. 3d 935, 939 (¶17) (Miss. Ct. App. 2019) (quoting *Russell v. State*, 73 So. 3d 542, 545 (¶9) (Miss. Ct. App. 2011)). "Relief must be denied if the movant fails to meet any one of these four elements." *Kidd v. State*, 221 So. 3d 1041, 1043 (¶9) (Miss. Ct. App. 2016) (quoting *Van Norman v. State*, 114 So. 3d 799, 801 (¶11) (Miss. Ct. App.

11

2013)).  Furthermore, by entering a guilty plea, the defendant admits "that he committed the offense[; so] . . . by definition, a plea of guilty negates any notion that there is some undiscovered evidence which could prove his innocence." *Massey v. State*, 131 So. 3d 1213, 1219 (¶27) (Miss. Ct. App. 2013) (quoting *Chancy v. State*, 938 So. 2d 267, 269 (¶9) (Miss. Ct. App. 2005)).

¶19.    To support her claim, Wilkerson attached reports and/or affidavits from the following medical experts:

> Dr. John Plunkett, a forensic pathologist, reviewed Tristan's medical records and autopsy report, and attested that CVT "caused Tristan's collapse . . . and subsequent death," not "[m]echanical trauma" or "shaking," and that "[t]he subdural hematoma described at autopsy was chronic, or more than a week old."  Dr. Plunkett also noted "a discrepancy regarding the body weight reported in the autopsy."  Dr. Plunkett specifically determined that the "damage to [Tristan's] brain was an ongoing process that began many days, if not weeks, before Tristan collapsed in [Wilkerson's] care."  Regarding the retinal hemorrhage, he noted that it was "a cascade phenomenon, a secondary event[,] . . . merely indicat[ing] that [Tristan] had either structural or functional occlusion of the veins, obstructing the returning blood from the eyes to the heart." Dr. Plunkett concluded that "Tristan's fatal injuries, evident at autopsy, did not occur on July 18, the date of Tristan's collapse," but rather "[a]ll of his brain findings except for those clearly referable to his status on a respirator pre-date his collapse by many hours if not days or weeks."

> Dr. Waney Squier, a neuropathologist, viewed Tristan's medical slides and Dr. Plunkett's report.  Dr. Squier noted the "subdural hemorrhage is at least 3-4 weeks old . . . [and] . . . [t]he changes in the brain are at least 3 days old and appear to have predated admission by at least one day."  The neuropathology indicated "venous thrombosis" and there was "old subdural bleeding which may have originated at birth."  Dr. Squier acknowledged that she "ha[d] not seen the original case notes, the autopsy report or brain scans."

> Dr. John Galaznik, a board-certified pediatrician, attested that the American Academy of Pediatrics (AAP) released a report shortly after Wilkerson pled

12

guilty, which "acknowledged that there is a developing recognition of other causes of brain injury that can 'mimic' the triad of findings traditionally asserted as justifying a presumption of abuse by abusive shaking of an infant or toddler." He further reported that, in 2009, the AAP revised its policy regarding SBS, now using the broader term "AHT," and noted "the controversy surrounding the validity of the traditional SBS diagnosis." Dr. Galaznik opined that this acknowledgment by the AAP "raises serious doubts about the validity of previous convictions based on shaking as a mechanism for the death of children."

In a subsequent motion for discovery, Wilkerson attached two additional affidavits by expert witnesses, Dr. Janice Ophoven and Dr. Gregory Shoukimas.

Dr Ophoven, a pediatric forensic pathologist, reviewed Tristan's medical records, including the autopsy, as well as the investigative records and reports from Drs. Plunkett and Squier. She opined that the "clinical, pathological, neuropathological, and radiologic evidence all support th[e] conclusion" that "the processes that led to Tristan's death began weeks before his collapse[.]" Dr. Ophoven concluded that "[t]he autopsy findings clearly demonstrate the brain was not that of a normal eight-week-old infant who had experienced acute trauma. Instead, it shows chronic damage: extensive necrosis and damage to the brain stem and spinal cord."

Dr. Shoukimas, a board-certified neuroradiologist, attested that "[c]ontrary to the autopsy findings, the radiology actually shows a normally formed brain with classic signs of [CVT], a form of childhood stroke." He further opined that "the connection between retinal hemorrhages and nonaccidental injury is extremely controversial – and entirely unreliable, in any event." Dr. Shoukimas noted that the "default diagnosis" of SBS "utilized in 2005[,] . . . ha[d] become extremely controversial based on further research and developments over the last decade . . . [, and i]ts very existence – that these sort of intracranial and retinal findings are somehow unique or common to violent shaking – is, to many, doubtful."

The State's only response to Wilkerson's expert testimony was to argue that (1) "[t]he AAP's position has no bearing on the facts of this case"; and (2) Dr. Plunkett never examined Tristan and was "obviously biased toward the innocence of [Wilkerson]," classifying him as

13

a "hired expert."

¶20.    The circuit court rejected Wilkerson's claim, concluding that "the 'sea change' in the medical community regarding [SBS] is not newly discovered evidence but rather evidence that offers alternative explanations as to how Tristan's death occurred."  The court further noted that "[b]y pleading guilty, Wilkerson, under oath, conceded to the State's version of facts and evidence it intended to offer had her case gone to trial."[7]

¶21.    At oral argument, the State noted a recent opinion by this Court, *Shelby v. State*, No. 2019-CA-00034-COA, 2020 WL 4568969 (Miss. Ct. App. August 4, 2020), in which we were asked to consider this exact question:  whether evidence in the form of expert affidavits, noting growing criticism in the diagnosis of SBS, would be "newly discovered evidence" overcoming the UPCCRA procedural bars.  In that case, however, we declined to make any findings on this precise issue because the trial court *had held an evidentiary hearing*, "considered all of the evidence," and concluded that "it would not 'probably produce a different result' in a new trial."  *Id*. at *8 (¶42).

¶22.    Because Shelby was convicted after a jury trial, and her PCR motion was time-barred, she was required to file a motion for leave to file a PCR motion with the supreme court.  *See*

<hr>

[7] In the videotaped interview with Detective Jones, Wilkerson admitted to shaking Tristan, explaining that she "was just doing what I saw his own father do" in an attempt to wake the child.  At the plea colloquy, she simply acknowledged to the court that she shook him.  Wilkerson claimed in her first appeal before this Court that she was not provided an opportunity "to explain during her plea colloquy her 'own version of the alleged baby shaking.'"  *Wilkerson*, 89 So. 3d at 614 (¶8).  She never admitted to shaking the child violently.  The State proffered that the child had died of SBS.

14

*id*. at \*4 (¶22).  Her sole argument was that the newly discovered evidence of scientific developments occurring in the last decade that discredited the SBS hypothesis, as well as exculpatory expert testimony, entitled her to relief. *Id*. at \*4-5 (¶¶24-25).  The supreme court granted Shelby leave to file her PCR motion on this ground. *Id*. at \*4 (¶22).  The trial court thereafter conducted a three-day evidentiary hearing on the issue, allowing Shelby to present expert testimony. *Id*.  We find the supreme court's ruling in *Shelby*—allowing her to proceed in the trial court despite the time-bar—informative as to whether such newly discovered evidence can provide an exception to the time bar, if proved.

¶23.    Recently, in an analogous case, *Howard v. State*, 300 So. 3d 1011, 1017-19 (¶¶21-30) (Miss. 2020), the supreme court addressed whether recent changes in the American Board of Forensic Odontology (ABFO) guidelines for experts concerning bite-mark analysis was "newly discovered evidence."  As in *Shelby*, the supreme court granted the petitioner leave to file his time-barred PCR motion and ordered the circuit court to hold an evidentiary hearing on the issues. *Id*. at 1015 (¶12).  The court denied Howard's motion after the hearing, and on appeal the supreme court concluded:

> The 2013 and 2016 changes to the ABFO Guidelines had resulted from a dramatic change in the scientific understanding and acceptance of the reliability of individualizations in bite-mark analysis in the intervening years. This was newly discovered evidence not available at the time of Howard's trial in 2000.
>
> . . . .
>
> The present scientific understanding of the invalidity of identification through bite-mark comparison is a new, material fact that constitutes newly discovered

15

evidence under *Crawford* [*v. State*, 867 So. 2d 196, 203-04 (Miss. 2003)].

*Id*. at 1018-19 (¶¶25, 30) (citations omitted).  The supreme court reversed and rendered the court's denial of Howard's PCR motion, vacated his conviction and sentence, and remanded to the circuit court for a new trial.  *Id*. at 1020 (¶36).

¶24.   Although not controlling authority, we further find a similar case by the Michigan Court of Appeals informative to our discussion.  In *People v. Miller*, No. 346321, 2020 WL 4554873 at *1 (Mich. Ct. App. Aug. 6, 2020), Tonia Miller was convicted of second-degree murder in 2003 based upon evidence that she had "violently" shaken her eleven-week old daughter, resulting in the child's death.  Seventeen years later, she sought relief from the judgment, contending that newly discovered evidence of the "shift in scientific and medical opinion and the analyses conducted by her experts . . . warranted a new trial."  *Id*.  The trial "rejected [her] arguments [and] denied her the opportunity to present any evidence in support of her motion[.]"  *Id*.  The Michigan Court of Appeals reversed and remanded to the trial court for an evidentiary hearing on the issue, noting:

> As a threshold matter, Miller's eligibility for relief from judgment hinges on whether she can establish that the evidence on which she relies qualifies as newly discovered, and good cause for failing to raise the possibility of a competing pneumonia diagnosis or for neglecting to challenge the scientific reliability of the SBS/AHT diagnosis in 2003.  Without an evidentiary hearing, the trial court could not evaluate these questions in an informed manner.

*Id*. at *5, *8.

¶25.   Like the present case, the trial court in *Miller* had determined that "because the 'alternative diagnosis put forth by defendant's new experts is based upon the exact same

16

medical and autopsy records relied upon by the trial experts,' it does not qualify as 'newly discovered.'" *Id*. at *6. But the Michigan Court of Appeals reasoned:

> [C]hanges in interpretations of medical and autopsy records derived from a shifting understanding of the underlying science require that we view the evidence through a different lens[.] . . . The parties agree that the underlying physical evidence (the medical and autopsy records) remains the same. The scientific understanding of those records has allegedly changed. If the opinions espoused by Miller's experts gained acceptance only after her 2003 trial, that evidence potentially qualifies as newly discovered. *Absent an evidentiary hearing, the trial court was unable to construct a timeline of scientific consensus regarding SBS/AHT over the past 20 years*. A shift in scientific consensus undermining the evidence presented at trial would indeed constitute newly discovered evidence.

*Id*. (emphasis added). Thus, the trial court's "decision that the newly discovered evidence could not have changed the trial's outcome cannot withstand scrutiny" due to its failure to conduct an evidentiary hearing on the issue. *Id*.

¶26.    Relying on *Shelby* and *Howard*, and in accord with *Miller*, it is evident that although the "underlying physical evidence (the medical and autopsy records) remains the same," *id.*, changes in experts' "scientific understanding" on issues such as bitemark analysis and SBS may constitute newly discovered evidence, excepting such claims from procedural bars under the UPCCRA. Therefore, we reverse and remand for the trial court to conduct an evidentiary hearing and allow Wilkerson to provide expert testimony on this issue.

¶27.    Wilkerson also argues that "the recent discovery of the video by post-conviction counsel constitutes 'newly discovered evidence.'" In this instance, we cannot find the video evidence containing the alleged *Miranda* violation is "of such nature that it would be

17

practically conclusive that, if it had been introduced at trial, it would have caused a different result in the conviction or sentence." *See* Miss. Code Ann. § 99-39-23(6). Therefore, we find no additional exception to the procedural bars based upon the discovery of the videotape by PCR counsel. However, the issue of the discovery of the video is relevant to Wilkerson's claims of a *Brady* violation and ineffective assistance of counsel, as discussed below.

## II. *Brady* Violation

¶28. Addressing Wilkerson's claim that the State purposely suppressed the exculpatory video of the full interrogation, the trial court concluded that because Wilkerson entered a guilty plea, she "waived her right to assert a *Brady* claim," and therefore, it was not necessary to make a determination as to whether the State suppressed the video or whether defense counsel received the video and failed to review it. In its ruling, the court relied on *Walton v. State*, 165 So. 3d 516, 525 (¶33) (Miss. Ct. App. 2015), in which we expressly held that the entry of a guilty plea precludes a defendant "from asserting a *Brady* violation."

¶29. Wilkerson contends on appeal that "[t]he State suppressed th[e] exculpatory videotape and instead provided Wilkerson's attorneys with two misleading transcripts" and that *Walton* does not "prevent the application of *Brady* to the limited facts of this case." The State makes no argument concerning the issue of waiver, relying solely on its assertion that because the video had been provided to defense counsel, there was no *Brady* violation.[8]

---

[8] The trial court made no factual findings as to whether the video containing the thirty-two minutes was produced.

18

¶30.    As we noted in *Walton*, the United States Supreme Court has not "directly addressed" this precise issue. *Id*. at 524 (¶30). However, in *Matthew v. Johnson*, 201 F.3d 353 (5th Cir. 2000), the United States Court of Appeals for the Fifth Circuit reasoned that "[b]ecause a *Brady* violation is defined in terms of the potential effects of undisclosed information on a judge's or jury's assessment of guilt, it follows that the failure of a prosecutor to disclose exculpatory information to an individual waiving his right to trial is not a constitutional violation."  *Walton*, 165 So. 3d at 524 (¶30) (quoting *Matthew*, 201 F.3d at 361-62). Thereafter, the United States Supreme Court concluded in *United States v. Ruiz*, 536 U.S. 622 (2002), "that the Constitution does not require the government to disclose material impeachment evidence prior to entering a plea agreement with a defendant[.]" *Walton*, 165 So. 3d at (¶31) (emphasis omitted) (citing *Ruiz*, 536 U.S. at 628).  The Fifth Circuit subsequently extended *Ruiz*'s holding to include "cases involving material exculpatory evidence" in *United States v. Conroy*, 567 F.3d 174, 179 (5th Cir. 2009).  *Walton*, 165 So. 3d at (¶32) (emphasis omitted).

¶31.    Citing *Ruiz*, Wilkerson argues that the Supreme Court has yet to determine "whether *Brady* applies to guilty pleas outside the narrow context of impeachment evidence, an inherently trial-specific right." *See Ruiz*, 536 U.S. at 633.  Wilkerson contends that there is "a distinction between impeachment and exculpatory evidence" and that the government's

suppression of "material exculpatory evidence before a guilty plea . . . violates *Brady*."[9]

Thus, noting our reliance on *Matthew*, *Conroy*, and *Ruiz* in *Walton*, Wilkerson asserts that

the "lack of binding precedent on this issue" leaves our Court with the freedom to decide in

her favor.

¶32.    We find Wilkerson's arguments unpersuasive. First, *Walton is* binding precedent on

this Court.[10]  *See, e.g*, *Willard v. State*, 219 So. 3d 569, 577 (¶33) (Miss. Ct. App. 2017)

(noting that because there was binding precedent by this Court on an issue, "stare decisis and

the current state of the law require[d] that we find no merit").  Second, we have re-examined

this issue, particularly the Supreme Court's analysis in *Ruiz*, and conclude that a finding of

waiver is appropriate under the circumstances of this case.

¶33.    Addressing a "criminal defendant's waiver of the right to receive exculpatory

---

[9] *See United States v. Fisher,* 711 F.3d 460, 469 (4th Cir. 2013) ("If a defendant cannot challenge the validity of a plea based on subsequently discovered police misconduct, officers may be more likely to engage in such conduct, as well as more likely to conceal it to help elicit guilty pleas."); *Sanchez v. United States,* 50 F.3d 1448, 1453 (9th Cir. 1995) (reasoning that "prosecutors may be tempted to deliberately withhold exculpatory information as part of an attempt to elicit guilty pleas"); *Buffey v. Ballard,* 782 S.E.2d 204, 221 (W. Va. 2015) (allowing a defendant to withdraw his guilty plea where the State delayed producing an exculpatory DNA test).
    Wilkerson also cites Mississippi Court of Appeals cases where we addressed the merits of a petitioner's *Brady* claims even thought he had entered a guilty plea.  Three of the four cases were decided prior to our holding in *Walton*, and in the fourth case, we merely held that the petitioner failed "to show that the State suppressed material evidence," and therefore, "his claim regarding an alleged *Brady* violation fai[ed]." *Keyes v. State*, 281 So. 3d 40, 42 (¶15) (Miss. Ct. App. 2019).

[10] *Walton* was decided by a near-unanimous vote, with only one judge dissenting without a written opinion.

impeachment material,"[11] the *Ruiz* Court noted that when a defendant enters a guilty plea, he

"forgoes not only a fair trial, but also other accompanying constitutional guarantees." *Ruiz*,

526 U.S. at 628-29 (citing *Boykin v. Alabama*, 395 U.S. 238, 243 (1969)). Notably, the

Supreme Court considered several factors before concluding that the Constitution does not

require "preguilty plea disclosure of impeachment information." *Id*. at 629. The Supreme

Court reasoned:

> It is particularly difficult to characterize impeachment information as critical information of which the defendant must always be aware prior to pleading guilty given the random way in which such information may, or may not, help a particular defendant. The degree of help that impeachment information can provide will depend upon the defendant's own independent knowledge of the prosecution's potential case—a matter that the Constitution does not require prosecutors to disclose.
>
> Second, we have found no legal authority embodied either in this Court's past cases or in cases from other circuits that provides significant support for the Ninth Circuit's decision. To the contrary, this Court has found that the Constitution, in respect to a defendant's awareness of relevant circumstances, does not require complete knowledge of the relevant circumstances, but permits a court to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor.

*Id*. at 630. One of these situations identified in *Ruiz* is a defense counsel's misjudgment as

to the admissibility of a confession. *Id*. (citing *McMann v. Richardson*, 397 U.S. 759, 770

---

[11] The issue in *Ruiz* was the constitutionality of a fast-track plea provision that required the defendant to waive her right to disclosure of impeachment evidence by the prosecution. *Ruiz*, 536 U.S. at 625-26.

(1970)).[12]  Here, the allegedly undisclosed information is not exculpatory in the sense that

it does not provide evidence that the defendant was actually innocent but only that a possible

*Miranda* violation would have supported a motion to suppress the defendant's confession.

Accordingly, we find that the information allegedly undisclosed by the State in this

circumstance is more akin to those circumstances identified by the *Ruiz* Court when it found,

"It is difficult to distinguish, in terms of importance, (1) a defendant's ignorance of grounds

for impeachment of potential witnesses at a possible future trial from (2) the varying forms

of ignorance at issue in these cases." *Ruiz*, 536 U.S. at 631.[13]

---

[12] In *McMann*, the Supreme Court reasoned:

> A conviction after trial in which a coerced confession is introduced rests in part on the coerced confession, a constitutionally unacceptable basis for conviction.  It is that conviction and the confession on which it rests that the defendant later attacks in collateral proceedings.  The defendant who pleads guilty is in a different posture.  He is convicted on his counseled admission in open court that he committed the crime charged against him.  The prior confession is not the basis for the judgment, has never been offered in evidence at a trial, and may never be offered in evidence.  Whether or not the advice the defendant received in the pre-*Jackson* era would have been different had *Jackson* then been the law has no bearing on the accuracy of the defendant's admission that he committed the crime.

*McMann*, 397 U.S. at 773.

[13] We recognize that there is a split of authority among federal circuit courts as to whether a *Brady* violation would permit a defendant to withdraw his or her guilty plea.  In addressing this novel issue in *Walton*, this Court appropriately relied on the Supreme Court's reasoning in *Ruiz* and the Fifth Circuit's analyses in *Matthew* and *Conroy* in concluding that a defendant's guilty plea waives a claim of a *Brady* violation.  *See Holmes v. Campbell Props. Inc.*, 47 So. 3d 721, 727 (¶22) (Miss. Ct. App. 2010) ("While not binding, Fifth Circuit decisions are generally regarded by our state appellate courts as highly persuasive authority.").  Accordingly, we decline to overturn our holding in *Walton* based on the

22

¶34. Therefore, we agree with the circuit court's finding that by entering her guilty plea, Wilkerson waived her claim of a *Brady* violation, and no hearing is required on this issue.

### III. Ineffective Assistance of Counsel

¶35. Wilkerson asserted in her 2015 PCR motion that counsel was ineffective for failing (1) "to adequately investigate the SBS diagnosis" and consult experts who would have challenged the State's theory that Tristan died of SBS; (2) to review pertinent witnesses (e.g., Tristan's parents, Detective Jones, and treating physicians), and (3) "to move to suppress Wilkerson's statements after she [had] invoked her constitutional right to an attorney."[14]

¶36. Denying the motion, the trial court ruled that because Wilkerson had raised a claim of ineffective assistance of counsel in her 2010 PCR motion, her claims were "now barred by the doctrine of res judicata." However, "[i]n an abundance of caution," the court addressed the merits of the claims, determining that (1) Wilkerson failed to demonstrate "that knowledge of facts from an investigation would have caused her counsel to vary from his advice to take a plea bargain"; and (2) it was unnecessary to address whether counsel received the video" because [she] had waived her right to assert a *Brady* claim when she pled guilty." With regard to Wilkerson's alternative argument that counsel was ineffective for failing to file a motion to suppress her statement, the trial court acknowledged that

---

arguments set forth in Judge McCarty's dissent.

[14] Wilkerson also averred in a December 2014 affidavit that defense counsel "never asked [her] to tell them [her] version of events of July 18, 2005" and "did not follow up on any possible leads in [her] case."

"Wilkerson may have had a good basis for a motion to suppress based on a *Miranda* violation," but the court concluded that "her statements prior to her first request for an attorney would not have been suppressed" and that "the inconsistent stories she told various law enforcement officers, fire and rescue personnel, and hospital employees would potentially still have been admissible had this case proceeded to trial."

¶37.   Appealing the court's ruling, Wilkerson asserts that her defense attorneys rendered ineffective assistance by failing (1) "to conduct even a cursory investigation of medical experts to challenge the State's contention that [Tristan's] death was caused by shaking" and (2) to file a motion to suppress her confession based on the *Miranda* violations contained in the video.[15]

¶38.   As we held in Wilkerson's prior appeal:

> To prevail on her claim of ineffective assistance of counsel, Wilkerson must show: (1) her counsel's performance was deficient, and (2) the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To perform deficiently, an attorney must fail to meet "an objective standard of reasonableness." *Id*. at 688. There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689.

*Wilkerson*, 89 So. 3d at 616 (¶21). "As applied to the plea process, the focus of the first prong remains the same, while the second prong focuses on whether counsel's unprofessional performance affected the outcome." *Hannah v. State*, 943 So. 2d 20, 24 (¶7) (Miss. 2006)

---

[15] Because Wilkerson has not raised any of her other claims on appeal with regard to ineffective assistance, we deem any other claims cited in her PCR motion waived.

(citing *Hill v. Lockhart*, 474 U.S. 52, 58 (1985)).  Thus, "[i]n the context of guilty pleas, this means the defendant must show that, were it not for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  *Hill v. State*, 60 So. 3d 824, 827 (¶5) (Miss. Ct. App. 2011) (quoting *Burrough v. State*, 9 So. 3d 368, 375 (¶22) (Miss. 2009)).

### A. Failure to Retain Expert Witnesses to Rebut the SBS Diagnosis

¶39.    The court found that this claim was "barred by the doctrine of res judicata."  As this Court has held, "res judicata prevents the litigation of claims that were made or should have been made during previous litigation."  *Stokes v. State*, 199 So. 3d 745, 749 (¶12) (Miss. Ct. App. 2016) (citing *Hill v. Carroll County*, 17 So. 3d 1081, 1084 (¶8) (Miss. 2009)).  Wilkerson contends that "even if *res judicata* applied [to her claims of ineffective assistance], it would not preclude most of the arguments [she] makes here because she did not raise these issues in her first petition."

¶40.    With respect to her claim concerning counsel's failure to retain witnesses to rebut the SBS diagnosis, we must disagree.  In her 2010 PCR motion, Wilkerson asserted that counsel was ineffective for failing "to secure any witnesses who would testify that the child did not die of what is call[ed] 'baby shaking.'"  The circuit court denied her motion without an evidentiary hearing, finding she was not entitled to any relief.  *Wilkerson*, 89 So. 3d at 613 (¶6).  We affirmed the ruling on appeal, finding that with regard to her attorneys' failure to "discover[] exculpatory witnesses, . . . [Wilkerson] fail[ed] to plead this issue with the specific detail required to support a prima facie showing of prejudice."  *Id*. at 616 (¶24).

25

Therefore, because Wilkerson brought this specific claim of ineffective assistance of counsel in her prior PCR motion, we uphold the court's finding that the claim is barred by res judicata.[16]

### B. Failure to File a Motion to Suppress Her Statement

¶41. The Mississippi Supreme Court has held, "The failure to file a suppression motion does not constitute per se ineffective assistance of counsel." *Shinstock v. State*, 220 So. 3d 967, 971 (¶16) (Miss. 2017) (quoting *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986)). However, "counsel may be deemed ineffective where counsel fails to move to suppress evidence obtained in violation of the accused's constitutional rights if the petitioner shows that the motion would have been meritorious and that prejudice resulted from the evidence's admission." *Crawford v. State*, 218 So. 3d 1142, 1161 (¶67) (Miss. 2016) (citing *Davis v. State*, 743 So. 2d 326, 336 (Miss. 1999)). In *Davis*, the supreme court noted that it would be "certainly unusual in a capital case that there was no attempt by defense counsel to suppress the [defendant's] statement(s), and we would be hard-pressed to attribute this to trial strategy." *Davis*, 743 So. 2d at 336 (¶11).[17] Here, because there was no trial, Wilkerson's

---

[16] Although we make no findings as to the merits of this claim, we would note the holding of the United States Court of Appeals for the Sixth Circuit that a counsel's "failure to anticipate a coming wave of scientific research questioning the validity of SBS" was not ineffective assistance, because at the time of trial, counsel "simply did not have the scientific support to make a reasoned challenge to the admission of SBS evidence[.]" *Lutze v. Sherry*, 392 Fed. App'x. 455, 459 (6th Cir. 2010).

[17] As previously noted, "'[u]nder extraordinary circumstances,' ineffective assistance of counsel can constitute an exception to the statutory time-bar." *Morales*, 291 So. 3d at 369 (¶24) (quoting *Brown*, 187 So. 3d at 670-71 (¶7)). We cannot, therefore, accept at this time

26

confession was not admitted into evidence. Yet the confession was used as a basis for the State's charges and relied on by defense counsel in advising Wilkerson to enter her guilty plea to the lesser charge of depraved heart murder.

¶42. "In order for a claim of ineffective assistance of counsel to justify an evidentiary hearing, a claimant must raise sufficient questions of fact." *Loden v. State*, 818 So. 2d 367, 368 (¶5) (Miss. Ct. App. 2002) (citing *Walker v. State*, 703 So. 2d 266, 268 (Miss. 1997)). In *Walton*, we reversed and remanded for the trial court "to make findings of fact on whether [defense counsel] learned of [the exculpatory statements], whether he reviewed these with Walton prior to entering his guilty plea, and the effect any non-disclosure had on Walton's plea." *Id*. Because we find that Wilkerson has raised sufficient questions of fact as to whether the video was provided to defense counsel, we likewise find the circuit court erred in declining to make any findings of fact in this regard.

¶43. Responding to Wilkerson's PCR motion, the State asserted "that it fully complied with its discovery obligations and produced the videotape and audiotape of Petitioner's interview in discovery." The State also provided evidence in the record that Wilkerson's attorneys received a VHS tape from the district attorney's office. Yet one of her attorneys, Keith Miller, provided an affidavit on December 5, 2014, averring that he was only recently aware "that the interrogation had continued when the tape recorder was off, and that the detective

Presiding Judge Wilson's conclusion that Wilkerson's claims of ineffective assistance of counsel are procedurally barred. On remand, Wilkerson should be afforded an opportunity to prove that her case constitutes one of these "extraordinary circumstances."

27

had pressured [Wilkerson] to 'come clean' despite repeated requests by her to talk to a lawyer." Miller further testified that had he "been aware of the content of the non-audiotaped portion of the interrogation, [he] most likely would have moved to suppress the confession based on violations to [Wilkerson's] constitutional rights" and "most likely would not have advised [her] to plead guilty to depraved heart murder."

¶44.    If the court were to accept as true the State's evidence that it provided the videotape of Wilkerson's full interrogation to Wilkerson's attorneys, there would remain questions of fact as to whether defense counsel's failing to file a motion to suppress was deficient performance and prejudiced the defendant regardless of whether defense counsel viewed the video.  The United States Supreme Court has held:

> In many guilty plea cases, the "prejudice" inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial.  For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea.  This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial.

*Lockhart*, 474 U.S. at 59.  Similarly, in *Hannah*, our supreme court considered the second prong of *Strickland* in the context of a guilty plea, noting:

> [The defendant] must show that there is a reasonable probability that, but for counsel's errors, she would not have pleaded guilty, would have insisted on going to trial, and the outcome would have been different.  This Court has held that a reasonable probability arises when the ineffectiveness is of such sufficient moment that the integrity of the proceeding or our confidence in the

28

outcome has been shaken. *Leatherwood v. State*, 539 So. 2d 1378, 1385 (Miss. 1989).

*Hannah*, 943 So. 2d at 24 (¶7). Noting the conflicting evidence of guilt, the supreme court in *Hannah* found it "reasonable to conclude that the outcome of a jury trial may have been different" and remanded to the trial court for a full evidentiary hearing on the issue of ineffective assistance of counsel. *Id*. at 24, 27 (¶¶10, 20). As we noted in *Walton*, "[t]his is precisely the sort of record-making that is necessary to resolve the merits of this case." *Walton*, 165 So. 3d at 528 (¶44).

¶45.    Here, although the "sea change" in SBS diagnosis would not have been available, competent counsel could have obtained medical history and testimony regarding Tristan's possible underlying preexisting condition. Therefore, we disagree with the State's contention at oral argument that Wilkerson has failed to make a prima facie case of ineffective assistance of counsel because she has not demonstrated prejudice resulting from counsel's failure to file a motion to suppress.[18] As in *Walton*, we reverse and remand for the trial court to make factual findings regarding whether Wilkerson's attorneys received a video containing the thirty-two minutes of Wilkerson's interrogation, which the court acknowledged may have demonstrated "a good basis for a motion to suppress based on a *Miranda* violation." Should it be determined that defense counsel received the video, the

---

[18] Even if, as the trial court reasoned in its order, the portion of Wilkerson's statement prior to her invoking her right to an attorney would have been admissible, that evidence may have been interpreted by a jury as Wilkerson's attempting to find an explanation for the child's collapse, rather than as an admission of guilt.

29

court must further make a finding as to whether the failure to file a motion to suppress constituted deficient performance and whether the outcome of the case would have been different.

¶46. Accordingly, we reverse and remand to the trial court for further proceedings in accordance with this opinion.

¶47. **REVERSED AND REMANDED.**

**CARLTON, P.J., CONCURS. GREENLEE, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION, JOINED IN PART BY McCARTY, J. WESTBROOKS AND McDONALD, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WILSON, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. McCARTY, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED IN PART BY WESTBROOKS AND McDONALD, JJ. LAWRENCE, J., NOT PARTICIPATING.**

**GREENLEE, J., SPECIALLY CONCURRING:**

¶48. Wilkerson claims that the State's failure to provide the exculpatory video of her full interview in pretrial discovery violated her fundamental constitutional right to due process. I agree with the majority that by entering a guilty plea, Wilkerson waived her claim of a *Brady* violation. I also concur that the change in expert opinion on the cause of death deserves a hearing.

¶49. I write separately to emphasize that on remand the court should consider whether the videotape was produced in discovery only to the extent that it is necessary to discern whether Wilkerson received ineffective assistance of counsel.

¶50. In order to prove ineffective assistance of counsel, Wilkerson must show "(1)

30

counsel's performance was deficient and (2) the deficient performance prejudiced the defense." *Herrington v. State*, 102 So. 3d 1241, 1244 (¶10) (Miss. Ct. App. 2012) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

¶51. In an affidavit, one of Wilkerson's attorneys stated that he received two transcripts from the District Attorney's Office. However, neither transcript transcribed "the portions of [the interview] when the audio recorder was turned off but the video recorder remained on." Wilkerson's attorney stated that "to the best of [his] recollection [he] did not receive a video that contained the non-audiotaped portion of Amy Wilkerson's interrogation." Had he "been aware of the content of the non-audiotaped portion of the interrogation, [he] most likely would have moved to suppress the confession . . . ."

¶52. However, as the majority notes, a May 18, 2006 discovery receipt shows that a VHS tape was provided to Wilkerson's attorney. Attorneys should consult with their clients. Wilkerson should have recalled her interrogation, and her attorney should have elicited that information from her. Wilkerson has apparently not asserted that she does not recall what occurred during her interview with Detective Jones.

¶53. On remand, the court should consider whether counsel was deficient for failing to review the tape, failing to inquire about the VHS tape listed on the discovery receipt, and/or failing to make use of its contents or its nonreceipt prior to the entry of a guilty plea.

**McCARTY, J., JOINS THIS OPINION IN PART.**

**WILSON, P.J., CONCURRING IN PART AND DISSENTING IN PART:**

¶54. Wilkerson's claims alleging a *Brady* violation and ineffective assistance of counsel are barred by the statute of limitations and the statutory prohibition on successive PCR motions.[19] For that reason, the circuit court correctly denied relief on both claims. I concur with the majority's affirmance as to the *Brady* claim, though not its reasoning.[20] I dissent from the majority's decision to reverse and remand on the ineffective assistance claim.

¶55. I concur with the majority that Wilkerson's newly discovered evidence claim should be remanded for an evidentiary hearing.[21]

---

[19] Miss. Code Ann. § 99-39-5(2) (Rev. 2015) (providing that a PCR motion must be filed within three years after a judgment of conviction entered on a guilty plea); Miss. Code Ann. § 99-39-23(6) (Rev. 2015) (providing that an order denying a PCR motion "shall be a bar to a second or successive motion"); *Brown v. State*, No. 2018-DR-01256-SCT, 2020 WL 2079088, at *10 (¶57) (Miss. Apr. 30, 2020) ("[T]he *Brady* claim is subject to the time bar, the successive-writ bar, and res judicata.") (motion for rehearing pending); *Mason v. State*, 235 So. 3d 129, 131 (¶¶4-5) (Miss. Ct. App. 2017) (holding that a *Brady* claim is subject to the statute of limitations and successive writ bar); *Hopson v. State*, 300 So. 3d 1063, 1066 (¶9) (Miss. Ct. App. 2020) (recognizing that a claim of ineffective assistance of counsel is excepted from the statute of limitations and successive writ bar only in "extraordinary circumstances").

[20] In addition, there is no evidence of a *Brady* violation. The State submitted two affidavits and a discovery receipt showing that the video was produced. Wilkerson submitted nothing to contradict the State's evidence—only an affidavit from one of her two former attorneys, Keith Miller, stating that "to the best of [his] recollection [he] did not receive a video that contained the non-audiotaped portion of [the] interrogation." The discovery receipt was signed by someone acting on behalf of Wilkerson's other former attorney, Adam Miller. Wilkerson did not submit an affidavit from Adam Miller.

[21] Miss. Code Ann. § 99-39-5(2)(a)(i) (providing an exception to the statute of limitations for "cases in which the petitioner can demonstrate . . . that he has evidence, not reasonably discoverable at the time of trial, which is of such nature that it would be practically conclusive that had such been introduced at trial it would have caused a different result in the conviction or sentence"); Miss. Code Ann. § 99-39-23(6) (providing an exception to the successive writ bar in the same circumstances); *Chancy v. State*, 938 So. 2d

32

**McCARTY, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶56.   Because there are times a guilty plea might not be given knowingly, intelligently, or voluntarily if evidence was withheld, I respectfully dissent in part.

¶57.   The safeguard of due process in criminal proceedings requires the "avoidance of an unfair trial to the accused." *Brady v. Maryland,* 373 U.S. 83, 87 (1963).  This is why "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id*.

¶58.   This crucial guarantee is not just for the defendant in a criminal trial—for "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." *Id*.

¶59.   It naturally follows that because our system of justice suffers when an accused is treated unfairly, we must ensure guilty pleas are handled with the same eye toward fairness as criminal trials.  A guilty plea "forgoes not only a fair trial, but also other accompanying constitutional guarantees," such as "the Sixth Amendment right to confront one's accusers, . . . the Sixth Amendment right to trial by jury," as well as the rights "to a speedy and public trial" and "an impartial jury," among others.  *U.S. v. Ruiz*, 536 U.S. 622, 628-29 (2002); U.S. Const. amend. VI.  "Given the seriousness of the matter," the Court emphasized, "the

_____

251, 252-53 (¶4) (Miss. 2006) (holding that the newly discovered evidence exceptions apply even in cases in which the defendant pled guilty).

Constitution insists . . . that the defendant enter a guilty plea that is voluntary and that the defendant must make related waivers knowingly, intelligently, and with sufficient awareness of the relevant circumstances and likely consequences." *Id*. at 629 (cleaned up).

¶60. So this is where I must part ways with the majority. First, it is worth noting that the State did not raise the issue of waiver. Therefore, this point has not been briefed or extensively argued by the parties. Further, guilty pleas are only valid when they are done knowingly, intelligently, and voluntarily. Yet if there is information undisclosed to the defendant, whether intentionally or not, *a defendant does not have the full picture before pleading guilty*. A *Brady* violation, if proven, annihilates a defendant's ability to plead knowingly—that is, "with sufficient awareness of the relevant circumstances and likely consequences." *Id*.

¶61. Our Court has recently found that "[a] plea is involuntary if a defendant is affirmatively misinformed regarding the possibility of parole and pleads guilty in reliance on that information." *Ulmer v. State*, 292 So. 3d 611, 614 (¶9) (Miss. Ct. App. 2020). Likewise, our Supreme Court has granted an evidentiary hearing to a defendant when his attorney's "failure to communicate with [him] affected the outcome of the plea process," and his lawyer failed to investigate his case. *Wilson v. State*, 81 So. 3d 1067, 1083 (¶17) (Miss. 2012). There is little difference in those scenarios and an alleged *Brady* violation. If a plea is flawed because the lawyer gave the client faulty advice, or could be flawed because they failed to communicate with the client or research the case, then it logically follows that a plea

34

could be flawed when a lawyer gives faulty advice *based on missing information* or does not follow up a lead *because they did not know there was a lead to follow*.

¶62.    The majority determines "the allegedly undisclosed information is not exculpatory in the sense that it does not provide evidence that the defendant was actually innocent but only that a possible *Miranda* violation would have supported a motion to suppress the defendant's confession." *Ante* at ¶33.  But suppressing a confession is no mere formality: it could very well be the difference between conviction and acquittal at trial.

¶63.    The majority looks to the United States Supreme Court precedent to determine that a "plea of guilty based on reasonably competent advice is an intelligent plea not open to attack on the ground that counsel may have *misjudged* the admissibility of the defendant's confession." *McMann v. Richardson*, 397 U.S. 759, 770-71 (1970) (emphasis added).  Yet when we are talking in the context of *Brady*, there is nothing for an attorney to "misjudge." For you can only "misjudge" information *when you know it exists*.  The key concern of *Brady* is that due process is violated when information is not provided to a defendant, so the ability to defend at trial is compromised.  This concern may even be *more* heightened during a guilty plea when one is forfeiting constitutional rights.

¶64.    This crucial distinction matters in this appeal because, accepting Wilkerson's telling of the facts as true, her counsel *did not even know* the circumstances leading to her confession.  It was not that the lawyer then "misjudged" the admissibility, as referred to in *McMann*, but that the lawyer was not able to make a judgment call *one way or the other*.

¶65. This is precisely why a claim of a *Brady* violation should survive the general waiver of a guilty plea—because information which was allegedly kept back could vigorously impact whether a plea was made knowingly, intelligently, and voluntarily.

¶66. The majority grounds its finding of waiver on this Court's 2015 adoption of the Fifth Circuit approach. But even that federal court admitted it was in the minority since its sister circuits "*have generally* held that a defendant pleading guilty may challenge his conviction on the ground that the State failed to disclose material exculpatory evidence prior to entry of the plea." *Matthew v. Johnson*, 201 F.3d 353, 358 (5th Cir. 2000) (emphasis added). Indeed, one federal court has had a test for decades now, having found "[a] *Brady* violation does not *automatically* entitle a defendant to withdraw a guilty plea." *U.S. v. Nagra*, 147 F.3d 875, 881 (9th Cir. 1998) (emphasis added).

¶67. In that circuit, the question "is whether there is a reasonable probability that but for the failure to disclose the *Brady* material, the defendant would have refused to plead and would have gone to trial." *Id*. at 882. This is "an objective" inquiry "that centers on the likely persuasiveness of the withheld information." *Id*. "Even if, as may have happened in these cases, a defendant became more likely to plead guilty in the face of overwhelming, and later partly discredited, evidence, there is no *Brady* violation in guilty plea cases when it is unlikely that a trial would have been materially affected by the absence of the discredited evidence." *Id*. This test would be a good fit in cases like this one—as opposed to pretending the withholding of information does not impact a plea.

36

¶68.   The Ninth Circuit is not alone in reviewing these types of claims. The Tenth Circuit has found that in light of "the importance to the integrity of our criminal justice system that guilty pleas be knowing and intelligent, we hold that, under certain limited circumstances, the prosecution's violation of *Brady* can render a defendant's plea involuntary." *United States v. Wright*, 43 F.3d 491, 496 (10th Cir. 1994). The Eleventh Circuit has also recently deeply considered whether an alleged *Brady* violation impacted a guilty plea, ultimately rejecting the claim. *U.S. v. Williams*, 824 F. App'x 750, 755-56 (11th Cir. 2020).

¶69.   Our law is clear that a guilty plea forfeits certain constitutional guarantees. But those forfeitures must be done knowingly; you cannot forfeit what you do not know about. Our justice system will be more fair when we guarantee that guilty pleas have the same due process safeguards as trials.

¶70.   I agree with the Court the petitioner is entitled to a hearing due to developments in science, and likewise agree with Judge Greenlee's view that the trial court should consider the issue of the videotape only as it impacts ineffective assistance of counsel. Yet I believe the better path is for us to consider alleged *Brady* violations, even when there is a guilty plea. For this reason I respectfully dissent in part.

**WESTBROOKS AND McDONALD, JJ., JOIN THIS OPINION IN PART.**